UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------X
HILDA SILVA,

                                    Plaintiff,                          **MEMORANDUM & ORDER**

            -against-                                                   07 CV 4530

MICHAEL J. ASTRUE,
Commissioner of Social Security,
                                    Defendant.
---------------------------------------------------X
DEARIE, Chief Judge.

Plaintiff Hilda Silva brings this action pursuant to 42 U.S.C. §405(g) for review of the

final decision of the Commissioner of Social Security that she is not entitled to Disability

Insurance Benefits and Supplemental Security Income. Both parties move pursuant to Rule 12(c)

of the Federal Rules of Civil Procedure for judgment on the pleadings. For the reasons set forth

below, plaintiff's motion for judgment reversing the decision is granted, and the case is

remanded for the calculation of benefits. Defendant's motion is denied.

### Background

Plaintiff was born in Peru in 1955 and moved to the United States in 1985. She has

worked in a factory making and packing plastic bows for shoes. Her last job was in

telemarketing, selling telephone services to the Spanish-speaking population. She stopped

working in September of 1999 when she underwent surgery on her left shoulder for a torn rotator

cuff.

Plaintiff filed a claim for benefits alleging a disability onset date of September 27, 1999,

her surgery date. For purposes of Disability Insurance Benefits, she remained insured through

December 31, 2004.

On June 18, 2002, plaintiff appeared without an attorney at a hearing before Administrative Law Judge Jonathan Jacobs. By decision dated June 20, 2002, ALJ Jacobs found her not disabled. (Tr. 51-56.) The Appeals Council granted plaintiff's request for review and remanded for further proceedings with directions to the ALJ: to obtain additional evidence including a mental status examination and medical source statements regarding plaintiff's abilities despite her impairments; further evaluate plaintiff's mental impairments; further consider claimant's maximum residual functional capacity; and obtain evidence from medical experts clarifying the limiting effects of her physical and mental impairments. (Tr. 60.) In addition, the ALJ was directed to obtain evidence from a vocational expert to clarify the effect of plaintiff's assessed limitations on her ability to perform work available in the national economy. (Id.)

Plaintiff appeared with an attorney at her second hearing on March 2, 2006. In a decision dated October 23, 2006, ALJ Marilyn Hoppenfeld found her not disabled. (Tr. 19-36.) ALJ Hoppenfeld concluded that although plaintiff could not perform her past relevant work, she had the residual functional capacity for light work that did not require her to reach overhead with her left arm and that was simple, repetitive and required no decision-making. (Tr. 24.) Further, the ALJ found that plaintiff could perform work as a ticket taker or a photocopier, jobs that exist in significant numbers in the national economy, and was, therefore, not disabled. (Tr. 35.)

### Discussion

Plaintiff's medical record indicates that she continued to have significant left shoulder limitations after her surgery. More importantly, however, the record makes clear that plaintiff

2

suffered from continuing psychiatric issues that were largely dismissed by the ALJ. Because the ALJ failed to meet her burden to adduce evidence of plaintiff's ability to engage in work existing in the national economy despite these non-exertional impairments, the Commissioner's decision must be reversed.

### *Standard of Review*

Under 42 U.S.C. § 405(g), this Court reviews the decision of the ALJ to determine whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." Green-Younger v. Barnhart, 335 F.3d 99, 105 (2d Cir. 2003) (quoting Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000) (internal quotation marks omitted)). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

### *Eligibility for Benefits*

A claimant is "disabled" within the meaning of the Social Security Act, and thus eligible for benefits, only if "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). The Social Security Administration has established a five-step process for making this determination:

In essence, if the Commissioner determines (1) that the claimant is not working,

(2) that he has a "severe impairment," (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

Green-Younger, 335 F.3d at 106 (alteration in original) (quoting Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002)). The burden of persuasion rests with the claimant at steps one through four. Curry, 209 F.3d 122-23. The Commissioner, however, bears the burden at the fifth step. Id. For the Commissioner to satisfy this burden, the ALJ may elicit the testimony of a vocational expert as to the existence of jobs that the claimant remains capable of performing. See Dumas v. Schweiker, 712 F.2d 1545, 1553-54 (2d Cir. 1983). The ALJ may pose hypothetical questions and rely upon the vocational expert's answers, provided the limitations assumed in the hypothetical questions are supported by substantial evidence. Id.


***Evaluation of Medical Opinions***

The regulations require that the ALJ consider every medical opinion in the record in evaluating the nature and severity of a claimant's impairments. 20 C.F.R. §§ 404.1527(d), 416.927(d). When evaluating an opinion of a "treating source," defined as a claimant's "own physician, psychologist, or other acceptable medical source who provides . . . or has provided . . . medical treatment or evaluation and who has, or has had, an ongoing treatment relationship" with the claimant, 20 C.F.R. §§ 404.1502, 416.902, the ALJ must apply a "rule of deference." Green-Younger, 335 F.3d at 106. Under the rule, the ALJ must give controlling weight to the treating source opinion provided it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.

20 C.F.R. §§ 404.1527(d), 416.927(d); <u>see also</u> <u>Burgess v. Astrue</u>, 537 F.3d 117, 128 (2d Cir. 2008) (citing, e.g., <u>Green-Younger</u>, 335 F.3d at 106 and <u>Shaw v. Chater</u>, 221 F.3d 126, 134 (2d Cir. 2000)). "Medically acceptable clinical and laboratory diagnostic techniques include consideration of a patient's report of complaints, or history, as an essential diagnostic tool." <u>Burgess</u>, 537 F.3d at 128 (internal quotation marks and alterations omitted) (citing <u>Green-Younger</u>, 335 F.3d at 107).

If a treating source's opinion either is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the record, the ALJ is not required to give it controlling weight. Instead, the ALJ must determine the weight to give it based on factors including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the support and explanation the source provides for the opinion, the opinion's consistency with the record as a whole, and whether the opinion is from a specialist in his or her area of specialty. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Pursuant to the regulations, the ALJ must provide "good reasons" for the ascribed weight. <u>Id.</u> Moreover, "in analyzing a treating physician report, 'the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.'" <u>Rosa v. Callahan</u>, 168 F.3d 72, 79 (2d Cir. 1999) (quoting <u>McBrayer v. Secretary of Health and Human Servs.</u>, 712 F.2d 795, 799 (2d Cir. 1983)). Nevertheless, "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve." <u>Veino v. Barnhart</u>, 312 F.3d 578, 588 (2d Cir. 2002).

Under the regulations, a social worker is not an "acceptable medical source" to which the rule of deference to treating sources applies. 20 C.F.R. §§ 404.1513(a), 416.913(a). A social

worker's opinion, however, is "other source" evidence that must be considered. 20 C.F.R. §§

404.1513(d) & 404.1529(c)(3), 416.913(d) & 416.929(c)(3); see also Lopez v. Barnhart, No. 05

Civ. 10635, 2008 WL 1859563, at *15 (S.D.N.Y. Apr. 23, 2008) (discussing weight accorded to

treating social worker's opinion).


*Psychological Evidence*[1]

### Dr. Michael Plokamakis, Plaintiff's Treating Internist, and
### Dr. Miguel A. Boraby, ACSW, BCD, Plaintiff's Psychotherapist

Plaintiff's mental health has been followed closely by her internist, Dr. Michael

Plokamakis, and her psychotherapist, Dr. Miguel Boraby, ACSW, BCD, a board certified social

worker. On April 5, 2000, Dr. Plokamakis, who had seen plaintiff approximately every two

months since January of 1995, reported that plaintiff had a history of depression and panic

attacks. (Tr. 155.) He noted that plaintiff had miscarried and had a hysterectomy, and had

undergone left shoulder surgery. (Tr. 155, 157.) At her last visit on April 1, 2000, plaintiff's

symptoms included left shoulder pain, depression and feelings of helplessness. (Tr. 155.) His

examination included findings that plaintiff exhibited a scared and depressed attitude, depressed

behavior, a depressed mood and affect, and decreased insight and judgment, but clear speech and

clear thought. (Tr. 158.) With regard to sensorium and intellectual functions, plaintiff exhibited

decreased attention and concentration and decreased memory, but her orientation, information

and ability to perform calculations were "OK." (Id.) He assessed plaintiff as having limited

understanding, memory, persistence, concentration, adaptation, and ability to socially interact as

---

[1]Because this Court's decision rests on the ALJ's assessment of plaintiff's psychological limitations, the evidence in the record with respect to plaintiff's physical impairments is not recounted.

6

a result of her depression. (Tr. 160.) In addition, he opined that her ability to perform work-related mental activities was "poor" because of her poor concentration. (Tr. 159-60). He prescribed Ativan.[2] On July 21, 2000, in a one-page note, Dr. Plokamakis reiterated that plaintiff had depression and panic attacks and cried "a lot." (Tr. 229.) She was unable to work because of her "psychological state" and her left shoulder pain. (Id.) Dr. Plokamakis also reported that plaintiff had seen and would continue to see a psychologist. (Id.)

On May 21, 2002, Dr. Plokamakis completed another medical report following an examination of plaintiff that same day. He recounted plaintiff's history of depression and panic attacks since 1995, noting that her depression had increased since she had two pregnancies that ended in miscarriages. He reported that she cried all the time, including at the time of her examination. (Tr. 232.) She was seeing a psychologist but discontinued anti-depressants because they made her "feel strange." (Tr. 232.) She continued to take Lorazepam for her anxiety. (Tr. 236.) According to Dr. Plokamakis, plaintiff's problems were "recurrent and active," and her "biggest" problem was depression. (Tr. 235.)

On June 7, 2002, just before plaintiff's first hearing, plaintiff's psychotherapist Dr. Miguel Boraby submitted a report. Plaintiff had been in individual therapy with him since August 8, 2000, for recurrent panic attacks. (Tr. 222.) Her insurance company covered her treatment for up to twenty sessions per year. (Id.) Dr. Boraby saw plaintiff once per week from August through October 2000, once per month from January to April 2001, and thirteen times between August 22, 2001 and the date of his report. He described plaintiff as having a history of anxiety, depression and obsessive compulsive disorder that resulted in marital problems and

---

[2]Ativan is the brand name for the anti-anxiety medication Lorazepam.

family difficulties. (Id.)  Dr. Boraby noted that plaintiff's "marital and work dysfunction have affected and limited the use of her intellectual capacity."  According to Dr. Boraby, she had become withdrawn and depressed, in part because she lost self-confidence as a result of her physical inability to work in the past three years, and her emotional state had deteriorated. (Id.)  Plaintiff suffered "sporadic episodes of desperation with long lasting inability to tolerate tension." (Id.)

Noting "significant improvement in mood and motivation," Dr. Boraby assigned plaintiff a current diagnosis of Axis I panic disorder with agoraphobia; obsessive compulsive disorder; parent-child relational problem; and major depressive disorder, recurrent in full remission. (Tr. 223.)  As Axis II, he diagnosed obsessive compulsive personality with depressive traits, and as Axis III, he diagnosed multiple physical ailments. (Id.)  He assessed plaintiff as having a current GAF[1] of 49, noting "[s]erious symptoms, severe obsessional rituals, with serious impairment in social, occupational [functioning], few friends, being unable to keep a job[,] withdrawal reactions fearing desperation and avoiding social anxiety." (Id.)  He added that her "[h]ighest GAF 3 years ago" was 41 with "[s]erious symptoms in similar fashion." (Id.)

In describing plaintiff's treatment, Dr. Boraby emphasized that plaintiff had been "working hard . . . within the parameters of a limited number[] of psychotherapy sessions." (Id.)  He further noted, however, that she had a "life adjustment that made her feel guilty and anxious with fears of failure as punishment and obsessive thoughts which continue[] to give her problems."  With respect to work, he stated:

> [s]hould [she] decide to secure a job further down into her future, she may need intensive therapy and rehabilitation.  Otherwise she may not be able to tolerate a

[1] On the DSM IV-TR Global Assessment of Functioning (GAF) Scale, a GAF of 41-50 means serious symptoms or any serious impairment in social, occupational, or school functioning.

stressful environment and multiple demanding situations. A low stress working situation, then, may not tamper with her current impairments and limited decision making abilities and flexibility . . . . [She] . . . is unable to function socially in a more normalizing manner due to her tendency to panic, anxiety, irritability and vulnerability to stress. This vulnerability gives access to her underlying problems making her anxious and depressed when she perceives external demands.

(Id.)

After plaintiff's first hearing, on June 16, 2003, Dr. Plokamakis wrote a three-page letter restating the psychological history he previously noted in his May 2002 report, including that plaintiff had two miscarriages in 1998 followed by a hysterectomy, that she had been seeing a psychologist and that she was taking Lorazepam for her panic attacks and depression. (Tr. 243-45.) He indicated that she continued to suffer from left shoulder pain and limitations after her rotator cuff surgery but said that since her two miscarriages, her "biggest disabling problem" was psychological. (Tr. 243-44.) Specifically, she could not concentrate, was always anxious, and had become dependent and indecisive, and very afraid of "situations." (Tr. 244.) These conditions had "paralyzed" her life. (Id.) In the Multiple Impairments Questionnaire detailing plaintiff's physical limitations that Dr. Plokamakis completed that same day, he indicated that emotional factors—depression and anxiety—contributed to plaintiff's functional limitations. (Tr. 267.) Dr. Plokamakis concluded that plaintiff was unable to hold a full-time, competitive job because of her depression and anxiety and that she was incapable of tolerating even low work stress. (Id.)

### Dr. Joseph Algaze, Consultative Examiner, and Dr. J. Curley, Ph.D., Non-Examining Consultant

On March 21, 2000, state consultative psychiatrist Dr. Joseph Algaze examined plaintiff. (Tr. 195-96.) Plaintiff reported to Dr. Algaze that she had "been feeling anxious and tense with

9

difficulties falling asleep for more than three or four years." (Tr. 195.) In addition, "she describe[d] becoming tremulous and unable to breathe." (Id.) She said that "she is frequently worried about the fact that she is not able to work, and she feels frequently overwhelmed with feelings of hopelessness and helplessness." (Id.) She had seen a psychiatrist on one occasion but stopped going when he "demanded" that she take Prozac. Lorazepam, prescribed by Dr. Plokamakis, helped when she became "hyper." (Id.) Dr. Algaze reported that she lives with her daughters and is "very dependent" on them for "most of her needs." (Id.) She told him that she is not able to concentrate, she has no friends, and she has no other significant social interaction. (Id.)

During his mental status examination, Dr. Algaze found that plaintiff was pleasant and cooperative, but appeared tense and anxious and had an anxious mood. (Tr. 195.) She made good eye contact, had clear speech, related well, and had "concrete, but logical" thinking. (Id.) With regard to attention and concentration, plaintiff made "occasional errors in doing a serial of threes." (Tr. 196.) She remembered three of three objects for three minutes, and two of three objects for 5 minutes. (Id.) Her "fund of information appeared average," and her insight and judgment were good. (Id.)

Dr. Algaze opined that plaintiff's allegations were consistent with his findings. (Id.) He concluded that she "suffers from mild difficulties in personal, social and occupational adjustment that impair her ability to tolerate work pressures," and noted that her "[v]ocational history appears consistent with the mental status exam." (Id.) He diagnosed Axis I adjustment reaction with anxiety and Axis II personality disorder. He further stated that her prognosis was "guarded" and that she should seek psychiatric help. (Id.)

On June 14, 2000, Dr. J. Curley, Ph.D., a non-examining state consultant, reviewed plaintiff's psychiatric record. (Tr. 197-205.) He diagnosed plaintiff as having adjustment reaction with anxiety but no personality disorder, (Tr. 201-02), and assessed her functional limitations as only "slight" with respect to restriction of activities of daily living and difficulties in maintaining social interaction. He concluded that she would "seldom" have deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner. (Id.) In addition, he completed a Residual Functional Capacity Assessment form indicating that plaintiff was moderately limited in her ability to perform scheduled activities and respond appropriately to changes in the work setting, and otherwise not significantly limited in her understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (Tr. 214-16.) Dr. Curley concluded that plaintiff "could understand and carry out work like procedures . . . sustain concentration and persistence [and] . . . adapt to [the] demands of a routine work setting." (Tr. 216.)

**Dr. Azariah Eshkenazi and Dr. Pavlos Kymissis, Consultative Examiners**

On June 17, 2003, after plaintiff's first hearing, psychiatrist Dr. Azariah Eshkenazi evaluated plaintiff at her attorney's request. Plaintiff told him that she developed severe panic attacks after her left shoulder surgery, became fearful of close spaces, and felt tense, nervous and agitated. (Tr. 271.) She said that she is unable to travel by subway and that friends stay with her during the day because she does not like to be alone. (Id.) With respect to medication, she told Dr. Eshkenazi that she takes Ativan but that it only helps her to sleep. (Id.) In his report, dated June 19, 2003, Dr. Eshkenazi opined that, in addition to her psychotherapist, she should see a

psychiatrist "to place her on medication to alleviate some of the severe symptoms of depression and panic attacks she experiences." (Id.)

During Dr. Eshkenazi's mental status examination, plaintiff appeared depressed, with a mood of anxiety and depression, and constricted affect. (Id..) She was polite, cooperative and coherent. (Id.) Her insight, judgment and memory were fair, and she had productive thought processes. (Id.) Dr. Eshkenazi diagnosed plaintiff with Axis I dysthymic disorder, Axis II generalized anxiety, and Axis III multiple somatic complaints (Tr. 272), and he assigned her a GAF of 60.[3] (Tr. 273.)

Dr. Eshkenazi completed a Psychiatric/Psychological Impairment questionnaire on the day of the examination in which he listed as positive clinical findings supporting his diagnosis: poor memory; appetite disturbance with weight change; sleep disturbance; mood disturbance; recurrent panic attacks; anhedonia; feelings of guilt/worthlessness; difficulty thinking or concentrating; social withdrawal or isolation; decreased energy; and generalized persistent anxiety. (Tr. 273.) He indicated that plaintiff had marked limitations in her ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workweek without interruptions from psychologically based symptoms and perform at a consistent pace; interact with the general public; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. (Tr. 276-77.) Dr. Eshkenazi also assessed plaintiff as capable of tolerating only low work stress and estimated that she would be absent from work more than three times a month. (Tr. 279-80.)

---

[4]According to the Global Assessment of Functioning Scale, a GAF score of 60 means moderate symptoms or moderate difficulty in social, occupational, or school functioning.

On November 3, 2004, psychiatrist Dr. Pavlos Kymissis examined plaintiff, also at her attorney's request. He provided a written evaluation dated November 13, 2004. Plaintiff told Dr. Kymissis that she had not seen Dr. Boraby for psychotherapy in the past year because her insurance would not cover the sessions, and she could not pay for them. (Tr. 283.) She continued to take Lorazepam as prescribed by Dr. Plokamakis. (Id.) Plaintiff said that in the past year her depression had become worse and her panic attacks more frequent. (Id.) She could not travel by herself or use public transportation, she had frequent nightmares, and she was afraid of dying. (Tr. 283-84.) Plaintiff "reported" that she spent most of her time at home. (Tr. 284.)

During the evaluation, plaintiff looked depressed, was tearful, and cried most of the time. (Id.) She had a depressed mood. (Id.) Dr. Kymissis noted that plaintiff "reported that she has problems with her short-term memory, and that she is not able to express herself." (Id.) Dr. Kymissis diagnosed plaintiff with Axis I major depression with panic disorder and Axis III medical problems related to her shoulder. (Id.) He assigned her a GAF of 50.[4] (Id.) He noted that she "has been suffering from chronic depression" and that "[h]er symptoms became worse after her medical problems that prevented her from working and made her dependent on her children." (Id.) He also stated that she was unable to work due to her frequent panic attacks. (Id.)

Dr. Kymissis completed a Psychiatric/Psychological Impairment questionnaire dated November 15, 2004, in which he listed as positive clinical findings supporting his diagnosis: poor memory; appetite disturbance with weight change; sleep disturbance; personality change; mood disturbance; emotional lability; recurrent panic attacks; anhedonia; psychomotor agitation or retardation; feelings of guilt/worthlessness; difficulty thinking or concentrating; oddities of

---

[5]A GAF score of 50 means serious symptoms or any serious impairment in social, occupational, or school functioning.

thought, perception, speech or behavior; social withdrawal or isolation; decreased energy; obsessions or compulsions; persistent irrational fears; generalized persistent anxiety; and somatization unexplained by organic disturbance. (Tr. 273.) He indicated marked limitations in her ability to travel unfamiliar places and use public transportation and in her ability to set realistic goals or make plans independently. (Tr. 288-90.) Like Dr. Eshkenazi, Dr. Kymissis found plaintiff moderately limited in her ability to remember locations and work-like procedures; perform activities within a schedule; and sustain an ordinary routine without supervision. (Id.) In contrast to Dr. Eshkenazi, however, he found her only moderately limited in her ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workweek without interruptions from psychologically based symptoms and perform at a consistent pace; interact with the general public; accept instructions and respond appropriately to criticism; and respond appropriately to changes in the work setting. (Id.) Nevertheless, he assessed plaintiff as not capable of tolerating even low work stress because of her panic attacks and estimated that she would miss work more than three times per month. (Tr. 291-92.)

### Plaintiff's March 2006 Hearing Testimony

Plaintiff confirmed at the March 2, 2006 hearing that she traveled to Peru in 1999, 2002, and every year since, to stay with her two brothers and two sisters. (Tr. 567.) According to plaintiff, her daughters arranged the trip each year for her "because [she] is alone in the house and they don't want to see [her] crying." (Id.) She cried during the hearing when discussing her siblings who had died. (Tr. 549-50.)

14

Plaintiff testified that since her shoulder surgery, she was afraid of leaving the house by herself and could not travel on the train alone. (Tr. 578-79.) She arrived at the hearing with her daughter via bus and train. (Tr. 547.) Plaintiff also confirmed that Dr. Plokamakis referred her to a psychiatrist who she saw twice. (Tr. 569.) She testified that she did not want to take the Prozac that he prescribed because it made her "feel more depressed," and she "got scared." (Tr. 569-70.) Dr. Plokamakis then referred her to Dr. Boraby whom she continued to see until 2002 when her insurance stopped covering her visits. (Tr. 569-70.) Plaintiff testified that she was unable to get places on time because she engaged in repetitive hand-washing and checking things in her house, including whether the stove was left on. (Tr. 579.) She arrived late to her hearing because of this behavior. (Id.)

### Vocational Expert Testimony

At plaintiff's second hearing, vocational expert Andrew J. Pasternak testified regarding jobs available in the national economy that, assuming various physical and psychological limitations, plaintiff could perform. The ALJ asked the vocational expert whether, if she accepted the June 2003 opinion of Dr. Eshkenazi, plaintiff could perform any jobs. (Tr. 594.) The vocational expert testified that "with that type of psychiatric profile, there would be no jobs that one could sustain on a competitive basis." (Tr. 595.) The vocational expert further testified that if the opinion of Dr. Kymissis were accepted, plaintiff could not perform any jobs. (Id.) In addition, on cross-examination by plaintiff's attorney, the vocational expert testified that if either Dr. Boraby's report of plaintiff's psychological limitations or the limitations noted in Dr. Plokamakis's June 16, 2003 Multiple Impairment's Questionnaire were accepted, there would be

15

no jobs plaintiff could perform. (Tr. 606-09.) The ALJ also asked the vocational expert whether, given plaintiff's physical limitations and assuming she "could do simple repetitive non-decision making jobs," she could perform any work. (Tr. 595-96.) Based on this hypothetical, the vocational expert testified that she could work as a ticket taker or photocopy machine operator. (Tr. 597.)

### The ALJ Decision

The ALJ found at step one of the disability determination that plaintiff had not worked since September 27, 1999. (Tr. 23.) At step two of the analysis, the ALJ determined that plaintiff had a severe impairment. She acknowledged that plaintiff "has a psychiatric condition that affects her ability to function" and that she "has received psychiatric treatment." (Id.) She determined at step three that plaintiff did not suffer from a listed impairment. (Id.) The ALJ noted that plaintiff had "a history of depression, anxiety and obsessive compulsive disorder, panic attacks and fears." (Tr. 24.) She found, however, "substantial evidence" that plaintiff was "able to perform the activities of daily living, . . . pay attention, concentrate, travel and think." (Tr. 24.) The ALJ further found that plaintiff was "not psychotic" and was "of average intelligence," was "able to cooperate with and interact with others," "socialize as her activities demonstrate," and "function in a routine work setting." (Id.)

At step four, evaluating plaintiff's residual functional capacity, the ALJ concluded that plaintiff was able to "perform simple, repetitive, routine tasks that do not require decision making, known as low stress work." (Tr. 34.) In arriving at her conclusion, the ALJ accorded treating physician Dr. Plokamakis's 2000 reports regarding plaintiff's psychological limitations

"little weight" on the ground that they "were issued by a person, with no psychiatric qualifications, and based upon observations and not mental examinations." (Tr. 27.) The ALJ added: "[i]t does not appear in this record that this medical internist referred claimant to any psychiatrist of [sic] mental facility for treatment of her alleged mental condition." (Tr. 27-28.) Overall, the ALJ discounted Dr. Plokamakis's opinion that plaintiff's psychological condition was her primary problem and that she suffered from "panic attacks, depression and anxiety, and could not concentrate and had limited ability to function mentally," on the ground that plaintiff's treating orthopedic surgeon, Dr. Walter Besser, found that plaintiff "did not display any behavior suggestive of a significant psychiatric disorder." (Tr. 32.) In addition, the ALJ characterized plaintiff's psychotherapy treatment with Dr. Boraby as "sporadic[]" and faulted his report for failing to include mental status findings. (Tr. 33.)

Considering the evidence from the consultative examining psychiatrists, the ALJ criticized Dr. Eshkenazi's Psychological Impairment questionnaire on the ground that it reflected positive clinical findings that were not also indicated on his accompanying mental status examination. (Id.) With respect to the evaluation from Dr. Kymissis, the ALJ emphasized that Dr. Kymissis wrote that plaintiff "reported" that she had problems with short term memory and "reported" that she spends most of her time at home. (Id.). The ALJ concluded:

> [T]he mental status findings and substantial evidence establish that the claimant is not confused or disoriented and is not psychotic. Additionally mental status findings indicate the claimant is able to remember and is able to pay attention and concentrate. She was found to have fair insight and judgment and she was observed to be cooperative and well related with average intelligence . . . .
>
> Furthermore, the claimant reported that she grocery shops with assistance, cooks daily, watches television, visits friends, talks on the telephone, spends time with other people, and uses public transportation and travels to Peru almost every year. Therefore, the assessments of the primary care physician and psychiatrists were contradicted by minimal mental status findings, particularly those of the impartial

17

consultant and psychiatrist who examined the claimant, the claimant's activities, and were not accepted.

Based on the substantial medical evidence, mentally the claimant has fair insight and judgment and she retains the ability to remember and concentrate as mental status findings revealed. Therefore, she is able to use judgment and understand, carry out and remember at least simple instructions. She is cooperative and mental status examination revealed she is well related and is not psychotic. Additionally, she has friends with whom she interacts and she is able to respond appropriately to supervision and co-workers. She is able to perform activities of daily living with some assistance due to her inability to perform heavy lifting. The claimant's intellectual functioning was observed to be average. Therefore, it is concluded that she is able to perform simple, repetitive, routine tasks that do not require decision making, known as low stress work.

. . .

As for the opinion evidence, the medical findings, the assessments and opinions of Dr. Algaze, [two consulting orthopedists], the State Agency medical consultant's assessment and the claimant's activities contradict the opinion and assessments of Dr. Plokamakis, Dr. Besser, Dr. Eshkenazi and Dr. Kymissis and the opinion of the treating sources are not given controlling weight.

(Tr. 33-34.)

The ALJ's analysis at this stage is flawed in several respects. The ALJ justified according treating physician Dr. Plokamakis's reports "little weight" because of his lack psychiatric qualifications. (Tr. 27.) Yet, despite the fact that Dr. Besser is an orthopedic surgeon also without psychiatric qualifications, the ALJ relied on his observation that plaintiff's behavior was not suggestive of a significant psychiatric disorder as a further ground for discounting Dr. Plokamakis's psychiatric conclusions. (Tr. 32.) Dr. Besser's observations, moreover, significantly predate those of Dr. Plokamakis and his treating relationship with plaintiff was far briefer, having begun in January of 1999. In addition, the ALJ minimized the significance of Dr. Plokamakis's findings and mischaracterized them them as "based upon observations and not mental examinations," (Tr. 27), overlooking Dr. Plokamakis's completion of the mental status

examination portion of the New York State disability determination form. (Tr. 158-61.)

The ALJ also justified giving Dr. Plokamakis's reports little weight on the ground that he did not refer plaintiff for psychiatric care for her "alleged mental condition." (Tr. 28.) Here, the ALJ is simply wrong. The record makes clear that Dr. Plokamakis referred plaintiff both to a psychiatrist who prescribed medication and to Dr. Boraby for psychotherapy. As demonstrated by the ALJ's description of plaintiff's therapy as "sporadic[]," the ALJ failed to take account of the session limits plaintiff's insurance company imposed that were clearly referenced in the record. Notably, the ALJ did not address in any way Dr. Boraby's diagnosis of obsessive compulsive disorder, the symptoms of which the ALJ belittled at the hearing when she referred to them as "[j]ust a few worries about the gas and everything." (Tr. 607.)

Ultimately, in evaluating plaintiff's residual functional capacity, the ALJ justified not according controlling weight to the psychiatric assessments and opinions of Dr. Plokamakis on the ground they were contradicted by the opinion of Dr. Algaze and the plaintiff's activities. (Tr. 34.) The ALJ also referenced an unnamed "State Agency medical consultant's assessment" as contradicting plaintiffs treating sources. (Id.)

Dr. Algaze's opinion, however, does not conflict with Dr. Plokamakis's opinion or the other opinions in the record to such a degree as to constitute substantial evidence to the contrary. Dr. Algaze noted deficiencies when he evaluated plaintiff's attention, concentration and memory. Although he characterized her difficulties as "mild," Dr. Algaze concluded that plaintiff's allegations were consistent with his findings. (Tr. 196.) He also acknowledged that her difficulties impaired her ability to tolerate work pressure. Moreover, Dr. Algaze's opinion was rendered only six months after plaintiff's rotator cuff surgery, at the beginning of a period during

19

which her mental health appears to have declined in part due to her physical inability to work. As Dr. Algaze noted, plaintiff's prognosis at the time was "guarded," and he suggested that she seek psychiatric help.

Dr. Algaze provided no accompanying assessment of plaintiff's residual functional capacity. Instead, Dr. J. Curley, Ph.D., who is not referred to by name in the ALJ's opinion but is likely the unnamed "State Agency medical consultant," assessed plaintiff's residual functional capacity based solely on a review of plaintiff's record. Dr. Curley supplied the only opinion in the record that plaintiff "could understand and carry out work like procedures . . . sustain concentration and persistence [and] . . . adapt to [the] demands of a routine work setting." (Tr. 216.) His assessment is inconsistent with the other residual functional capacity assessments, each of which was based on an examination, that indicate either marked or moderate limitations in plaintiff's ability to understand, remember and carry out detailed instructions; maintain attention and concentration; accept instructions; and respond appropriately to criticism from supervisors and changes in the work setting. Dr. Plokamakis, plaintiff's treating physician, also assessed plaintiff as "limited" in her understanding, memory, persistence, concentration and ability to socially interact as result of her depression. (Tr. 160.)

In addition, the ALJ overstated plaintiff's ability to engage in daily living activities and inappropriately emphasized the fact that she travels home to Peru approximately once a year. The ALJ recited that plaintiff "grocery shops with assistance, cooks daily, watches television, visits friends, talks on the telephone, spends time with other people, and uses public transportation." This list appears to be largely based on plaintiff's answers to a disability questionnaire filled out with the assistance of her daughter on August 15, 2000, and a report from

20

state examining physician Dr. Maurice Klein, dated April 14, 2005.[6] Plaintiff has otherwise consistently stated that she does only light cooking, has very few or no friends and is unable travel alone on public transportation. In addition, the fact that plaintiff travels to Peru to visit family is hardly an adequate basis for disregarding the psychiatric assessments in the record.

Finally, the ALJ's conclusion at step five that plaintiff is capable of performing work that exists in significant numbers in the national economy is not supported by substantial evidence. At plaintiff's second hearing, the vocational expert was directed by the ALJ to consider the extensive limitations found by Dr. Plokamakis, Dr. Boraby, Dr. Eshkenazi and Dr. Kymissis. Each time he testified that there were no jobs that plaintiff could perform. The vocational expert testified that work existed for plaintiff only when the ALJ posed a hypothetical question in which plaintiff's array of mental impairments were reduced to merely limit her to performing jobs that are simple, repetitive and do not involve making decisions. The ALJ's hypothetical, based on a stripped-down version of plaintiff's psychological limitations, however, does not correspond to any of the medical opinions in the record and reflects a substitution by the ALJ of her own judgment as to plaintiff's psychiatric condition. "[I]t is well-settled that 'the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion . . . . [W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted

---

[6] In her August 15, 2000 disability questionnaire, she wrote that with her daughters' assistance, she grocery shopped once per week and cooked every day. (Tr. 144.) She also said that she watched television, went out to visit with friends, and talked on the phone. (Id.) The April 14, 2005 orthopedic examination report submitted by state examining physician Dr. Maurice Klein includes as part of plaintiff's activities of daily living: "She cooks 2 to 3 times a week. . . . She also watches TV, listens to the radio, reads, goes out with her daughter, socializes with friends, and has a dog to keep her company. (Tr. 399.)

medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him.'" Balsamo, 142 F.3d at 81 (quoting McBrayer, 712 F.2d at 799) (alterations in original). Where "plaintiff's actual condition was not reflected in the underlying facts upon which the vocational expert based his assessment, that assessment is immaterial to the determination of whether or not plaintiff is disabled." Filocomo v. Chater, 944 F. Supp. 165, 170-71 (E.D.N.Y. 1996) (citing Dousewicz v. Harris, 646 F.2d 771, 774 (2d Cir. 1981)). Because the limitations in the hypothetical were not supported by substantial evidence, the Commissioner failed to meet its burden at the fifth step.

## Conclusion

Remanding for further administrative proceedings in this case would serve no purpose. See Curry, 209 F.3d at 124 (citing Balsamo, 142 F.3d at 82) ("Because the Commissioner failed to introduce evidence sufficient to sustain his burden on the fifth step in the case *sub judice*, remand for the sole purpose of calculating an award of benefits is mandated.") Accordingly, the case is remanded for the purpose of calculating benefits. This disposition is "particularly appropriate" in light of the fact that plaintiff's application has been pending since February 16, 2000. Id.

SO ORDERED.

Dated: Brooklyn, New York
    November 13, 2008

s/RJD

RAYMOND J. DEARIE
United States District Judge